# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
    Plaintiff,          )
                                   )
    v.          )          No. 21-03013-01-CR-S-MDH
                                   )
ALVAN ALLEN,          )
                                   )
    Defendant.          )

## REPORT & RECOMMENDATIONS

Before the Court is Defendant's Amended Motion to Suppress Statements and Evidence. (Doc. 41.) This matter has been referred to the undersigned for the purpose of submitting a report on any pretrial motions for suppression of evidence. Upon review, it is **RECOMMENDED** that the Motion be **DENIED**.

## I.    Background

Defendant has been charged by indictment with one count of receiving and distributing a visual depiction of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1), and one count of failure to register as a sex offender, in violation of 18 U.S.C. § 2250(a).

Pursuant to the Fourth and Fifth Amendments to the United States Constitution, Defendant seeks to suppress "all evidence seized and all statements made by [him] during and following his unlawful detention, search, and interrogation." (Doc. 41 at 1.) He first claims that "[e]vidence seized from [his] devices must be suppressed as they were not seized pursuant to a valid search warrant" on August 13, 2020. *Id.* at 3. Defendant then argues that his August 13, 2020 "statements should be suppressed as they were the fruit of the illegal search warrant and his illegal detention

and the result of a custodial interrogation." *Id*. at 5. Lastly, he asserts that his subsequent "statements on August 19, 2020, should be suppressed as fruit of the previous illegal search, seizure, detention, and unconstitutional custodial interrogation." *Id*. at 9.

The Government filed a Response in Opposition. (Doc. 47.) An evidentiary hearing was held on August 31, 2022. (Doc. 52.) Defendant appeared in person with his attorney, Kristin Jones, and the Government was represented by Assistant United States Attorney Jim Kelleher. (Doc. 54.) Law enforcement officers Lee Walker and Jeff Burnett appeared and testified. *Id*.

## II.    Findings[1]

Lee Walker is a cybercrimes detective with the Springfield Police Department ("SPD") and is also an officer on the Southwest Missouri Cyber Crimes Task Force and the FBI Violent Crimes Against Children Task Force. (Doc. 54 at 3.) He has been a police officer since 2004 and has received over 200 hours of specialized training regarding investigation of crimes involving the exploitation of children. *Id*. at 4. Det. Walker began investigating a person named Adam Nordin after a woman named Dawn Fritter reported on December 31, 2019, to the Springfield Police Department that Mr. Nordin had recorded sexual images of her minor daughter during a three-year period ending in May 2018. *Id*. at 4, 19. Det. Walker was present at a subsequent Child Advocacy Center ("CAC") forensic child interview of the minor victim on January 17, 2020, during which she disclosed that Mr. Nordin had recorded sexual images of her on his phone in May 2018. *Id*. at 4-5, 20.

In August 2020, Det. Walker then prepared an application for a search warrant of Mr. Nordin's apartment, located at 2935 West Maplewood, Springfield, Missouri ("2935 W Maplewood"). *Id*. at 5-6. In Det. Walker's experience, perpetrators of crimes related to sexual

---

[1] The facts set forth herein are taken from the testimony adduced and the exhibits admitted at the hearing on the motions. The Government's exhibit index appears as doc. 53. The hearing transcript appears as doc. 54.

2

exploitation of children tend to save images of those acts indefinitely, because such images are difficult to obtain. *Id*. at 7. Det. Walker has also observed that because devices can synchronize, data is frequently shared amongst electronic devices through home network systems. *Id*. at 7-8. Accordingly, the warrant application specifically identified the following "property, articles, materials, or substances to be searched for":

1. Records, information, and data related to the crime of Possession of Child Pornography, on any digital device, including but not limited to: Text messages, instant messages, call history, voicemail, contacts, IM screen names and email addresses, e-mail, phone settings, notes or memos, document files, audio files, calendar data, images, videos, Internet history, databases, logs, location data, RAM (Random Access Memory), records of use, ownership, custody, and control, and any deleted data. This includes records and information stored on the digital device or in any cloud service linked to the digital device.
2. Digital devices that can store records and information related to the crime of Possession of Child Pornography, including but not limited to: Computers, laptops, tablets, cell phones, digital cameras, video cameras, scanners, hard drives, flash drives, discs, media cards, tapes, cassettes, printers, computer hardware, and networking equipment.
3. Documents and other property related to digital devices and their operation, including manuals, printed or handwritten papers that contain usernames and/or passwords, and software.
4. Printed documents, printed photographs, video tapes, and any other audio/visual equipment that can show evidence of the crime of Possession of Child Pornography.

(Ex. 1 at 1.) The warrant application described the "premises to be searched" as "2935 W Maplewood #D101, [] an apartment located in Springfield, Greene County, Missouri" and included "a search of any persons present in the apartment at the time of the warrant service, as well as late arriving persons." *Id*. at 2. The warrant itself authorized the seizure of the above described property, articles, materials or substances followed by "an off-premises search of said items using whatever data analysis techniques appear necessary to locate and retrieve the evidence described." Id. at 13.

3

As probable cause that the described property would be found at this location, Det. Walker provided approximately six pages of information in the "Probable Cause" section of the warrant application, the entirety of which is incorporated into and made a part of this report. (Ex. 1 at 2-8.) A Judge of the Circuit Court of Greene County, Missouri reviewed and verified the allegations of the warrant application and on August 7, 2020, found that probable cause existed for the issuance of the search warrant. (Ex. 1 at 13-14.)

On the morning of August 13, 2020 at 8:00 a.m., Det. Walker arrived at 2935 W Maplewood to execute the search warrant. (Doc. 54 at 8, 24, 28.) He was accompanied by five other individuals, including Sergeant Jeff Burnett of the SPD, Detective Thomas Hicks, Greene County Deputy Joey Fletcher, Michael Costello for forensics, and a patrol officer "for uniform presence." *Id*. at 16, 24, 28. Other than Mr. Costello, who was an unarmed civilian employee of the SPD, all of the officers had guns and badges. *Id*. at 25-26. The patrol officer was in uniform, while the other four officers were wearing standard clothing and bulletproof tac vests with "Police" across the front and back. *Id*. at 25-27. After the five officers made initial contact, they removed their vests "because it's heavy and hot." Id. at 27.

The five officers walked up to the front door of the apartment, Det. Walker knocked on the door and announced "Police" and "search warrant." *Id*. at 9, 28, 45. For officer safety purposes, the first one or two officers had their guns drawn as they approached but holstered them "very quickly after getting [Defendant's] cooperation." *Id*. at 45. Defendant opened the door a few seconds later. *Id*. Det. Walker entered, showed Defendant the warrant and asked where Mr. Nordin was. *Id*. Defendant answered that Mr. Nordin was a truck driver and was not there. *Id*. Det. Walker then explained to Defendant that Mr. Nordin was the focus of the investigation and that he would like to ask him some questions, to which Defendant agreed. *Id*. at 30. Next, Det.

Walker and Det. Burnett accompanied Defendant to his room to collect clothes, shoes or cigarettes. *Id*. at 29. Det. Walker then told Defendant he would like to interview him outside, to allow the search of the apartment to proceed without interruption, to which Defendant agreed, asking if he could "smoke and drink coffee." *Id*. at 30-31. At some point while they were still inside the apartment, Det. Walker seized Defendant's phone from his person. *Id*. at 9, 33, 43. Det. Walker and Det. Burnett then accompanied Defendant to an open patio with no fence or bars outside the apartment. *Id*. at 10, 15; Ex. 2. At the start of the interview, Det. Walker again told Defendant that he was not the focus of the investigation and that he did not have to talk to them, making it clear to Defendant the interview was voluntary, or optional. (Doc. 54 at 11, 32, 50.) Det. Walker also told Defendant he did not intend to arrest anyone and at no point was Defendant read his *Miranda* rights. *Id*. at 15, 32.

During the interview, Det. Walker asked Defendant whether there was anything questionable on his phone, to which Defendant replied that he had "recently purchased the phone from an unknown person on a Walmart parking lot in Texas." *Id*. at 12. Det. Walker thought this was an unusual and roundabout answer and activated his audio recorder. *Id*. at 12, 35. Defendant further stated he "had discovered some child pornography images on the phone but he did not download them to the device." *Id*. at 13. Defendant also said he had deleted his photo gallery from the phone when the officers arrived. *Id*. at 14. At some points during the interview, Defendant got up and walked around the parking lot because of his bad back, at which times Det. Walker asked if he could walk with him to continue the interview. *Id*. at 15, 31-32, 45-46. At one point during the interview, Det. Walker went inside the apartment, and Det. Burnett stayed with Defendant, for officer safety reasons during the search of the apartment. *Id*. at 46, 49.

5

At the time of the August 13, 2020 interview, Defendant stated he lived primarily with his sister, and that he was only visiting Mr. Nordin at 2935 W Maplewood, although he had a lot of property in the apartment and a room reserved for himself. *Id*. at 42. Throughout the interview, Det. Walker maintained a calm and kind demeanor and did not try to deceive or intimidate Defendant, and Defendant was polite and cooperative. *Id*. at 43. Defendant was not taken into custody at the conclusion of the interview. *Id*. at 16-17.

On or about August 19, 2020, after learning that Mr. Nordin had returned home and committed suicide, Det. Walker returned to 2935 W Maplewood. *Id*. at 17, 37. He then conducted a second interview of Defendant in the front seat of Det. Walker's vehicle outside of the apartment. *Id*. at 17-18, 37, 40. Prior to conducting the interview, Det. Walker read Defendant his *Miranda* rights. *Id*. at 18, 37, 41. Defendant indicated that he understood his rights. *Id*. at 44. Defendant did not appear to be under the influence of alcohol or drugs at the time of the second interview. *Id*. at 44. Defendant was not taken into custody at the conclusion of the second interview. *Id*. at 18, 41.

### III. Conclusions

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005). Generally, evidence found because of an unlawful search or seizure, and the fruits therefrom, cannot be used against a defendant and must be suppressed. *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011).

### A. Probable cause to issue the search warrant

Defendant first claims that "[e]vidence seized from [his] devices must be suppressed as they were not seized pursuant to a valid search warrant." (Doc. 41 at 3.) Specifically, he argues

6

that "[t]he affidavit itself failed to establish any facts, other than bare bones 'professional experience' opinion of the officer and the warrant failed in any way to specify with any particularity which devices were subject to search." *Id*. at 5. Defendant further asserts that the affidavit relied on information that was five-years old and thus stale. *Id*. As a result, Defendant contends there was no probable cause to search his phone found on his person or the devices found in the room in which he was staying, nor any probable cause to search and seize other persons present during the execution of the search warrant. *Id*.

Per the Fourth Amendment, "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Scott*, 610 F.3d 1009, 1013 (8th Cir. 2010). A court determines whether probable cause exists by looking at the totality of the circumstances. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). In analyzing a warrant issued upon a supporting affidavit, "only the information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (cleaned up). Further, a court should examine affidavits supporting warrants "under a commonsense approach and not in a hypertechnical fashion." *Williams*, 10 F.3d at 593.

Here, the warrant application established probable cause. First, the affidavit indicated that the 13-year-old minor victim had disclosed to her parents that Mr. Nordin "sexually assaulted her and took photos of her in the shower" at the 2935 W Maplewood apartment, which was then reported to the Springfield Police. (Ex. 1 at 3.) Per the affidavit, at a subsequent interview conducted at the Springfield Child Advocacy Center, the minor victim disclosed that over a period of multiple years, Mr. Nordin had "touched her inappropriately, had her touch him, and took

7

pornographic photos of her." *Id*. Specific examples included: taking photos of her with his phone while she was in the shower; multiple instances of Mr. Nordin asking her to sit on his lap, then taking off her underwear and taking photos of her nude vagina with his phone; blindfolding her then putting his penis in her mouth; and, coming into her room, pulling down her pants and putting his penis in her butthole. *Id*. She also disclosed that she had seen nude images of herself on Mr. Nordin's phone, she knew Mr. Nordin would try to touch or kiss other young girls, and Mr. Nordin attempted to contact her friends. *Id*.

Det. Walker disclosed that Mr. Nordin's criminal history showed a 2008 arrest for 2nd Degree Statutory Rape, which was later dismissed. *Id*. The police report for this arrest indicated that officers found a runaway juvenile in Mr. Nordin's bed wearing only a t-shirt, and he told the officers they had sex. *Id*. Lastly, Det. Walker confirmed that Mr. Nordin currently lived at 2935 W Maplewood #D101 by speaking with management of the property. *Id*.

Det. Walker also provided his credentials in the affidavit, stating he has been a law enforcement officer with the Springfield Police Department since 2004 and a member of the Southwest Missouri Cyber Crime Task Force since 2016. *Id*. at 2. He offered that he has attended schools and seminars covering crime scene investigation, cybercrime investigation, and investigation of the crime of possession of child pornography, conducted several investigations and assisted in the issuance and execution of search warrants related to those crimes, and arrested suspects as a result of those investigations. *Id*.

Further, Det. Walker averred that "based on his personal observations or training and experience in law enforcement," that individuals who possess child pornography photos and videos also have child pornography in computer graphics image files, stored on computer diskettes or hard drives. *Id*. at 4. He stated that individuals involved in sexual exploitation of children "collect

sexually explicit materials involving children," including computer pictures, and most commonly acquire these materials by trading with other individuals with similar interests. *Id*. According to Det. Walker, such individuals "rarely, if ever, dispose of their sexually explicit material," and keep their materials in a secure place, most frequently their homes. *Id*. Also, a preferred method of trading, acquiring, and storing child pornography is via computers electronically, specifically on hard drives, disks, tapes, and diskettes. *Id*. Further, from his training and experience and speaking with digital forensics experts, Det. Walker stated that data originating on one digital media device will frequently be found on other digital devices due to individuals wanting to backup, view, move, hide, or erase data, so by seizing all digital media devices, more evidence is found as to use, custody, control and ownership. *Id*. Det. Walker also discussed "cloud computing," which allows users to electronically access records and other data remotely from any device that can connect to the internet, and that the "cloud" stores backups and/or data by default, sometimes without the user's knowledge. *Id*. at 6.

  In summary, the warrant application provided an extensive description of the specific evidence indicating Mr. Nordin had committed the crime of possession of child pornography at the 2935 W Maplewood apartment. Furthermore, the warrant application contained Det. Walker's general knowledge based on his extensive training and experience regarding investigations of the crime of child pornography explaining why evidence of that crime would likely be found on digital devices that can store records and information at that location. Thus, the warrant application, viewed in total, provided information showing a fair probability that contraband or evidence of a specific crime would be found at the location to be searched. Stated otherwise, the warrant application established probable cause to seize the devices and storage media described therein.

1.      **Particularity**

Defendant also claims the warrant "failed in any way to specify with any particularity which devices were subject to search." "To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Summage,* 481 F.3d 1075, 1079 (8th Cir. 2007) (citation omitted). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." *Id.* The particularity requirement "is a standard of 'practical accuracy' rather than a hypertechnical one." *Id*.

Here, the warrant specifically authorized the seizure of

Digital devices that can store records and information related to the crime of Possession of Child Pornography, including but not limited to: Computers, laptops, tablets, cell phones, digital cameras, video cameras, scanners, hard drives, flash drives, discs, media cards, tapes, cassettes, printers, computer hardware, and networking equipment

Ex. 1 at 3. At the time Det. Walker applied for the warrant, he knew that pornographic photographs of the minor victim existed but did not know the particular devices or media in which these photos may have been stored. Also, an on-site review of these items "could take many hours and perhaps days" and "would also make the search more intrusive." *Summage*, 481 F.3d at 1079 (citing *United States v. Hill*, 459 F.3d 966, 974-75 (9th Cir. 2006)). And "given the reality that child pornography is frequently stored in digital format, there was a fair probability that child pornography would be located on multiple devices" at 2935 W Maplewood. *United States v. Schave*, 55 F.4th 671, 676 (8th Cir. 2022) (holding search warrant authorizing search of entire residence for child pornography and not just one resident's room was not lacking for particularity). Additionally, the Government posits, and the undersigned agrees, that "to adopt the reasoning of the defendant's argument, suspects in an investigation would merely have to pass items of contraband to others

10

present in the residence to avoid the seizure of evidence," as criminals do not neatly label which electronic device belongs to whom. (Doc. 47 at 8.) Under these circumstances, a search for and seizure of a broad array of devices and storage media was appropriate and not lacking in particularity. Thus, this claim does not present a basis for suppression.

### 2. Staleness

Lastly, Defendant contends the affidavit relied on information that was five-years old and thus stale. "The date of the occurrence of the facts relied upon in an affidavit is of importance in the determination of probable cause because untimely information may be deemed stale." *Summage*, 481 F.3d at 1078. However, staleness is not determined by a bright-line test, but rather is "examined in the context of the specific case and the nature of the crime under the investigation." *Id*. The essence of sexual abuse of a child and production of child pornography "involves the abuse of a trust and power relationship, which frequently delays reporting until the minor has obtained majority." *United States v. Augard*, 954 F.3d 1090, 1094 (8th Cir. 2020). Further, it "is not a new revelation" that individuals involved in sexual exploitation of children do not quickly dispose of child pornography. *United States v. Lemon*, 590 F.3d 612, 615 (8th Cir. 2010) (holding an eighteenth month interim lapse did not render the information stale); *see also United States v. Espinoza*, 9 F.4th 633, 636 (8th Cir. 2021) (Eighth Circuit precedent "recognizes the compulsive nature of the crime of possession of child pornography and the well-established hoarding habits of child pornography collectors."); *Summage*, 481 F.3d at 1078 (when timeline of events was not included in the affidavit, "it could be presumed that [the defendant] would maintain in his possession the video and photographs [containing child pornography] that he made").

Here, although the affidavit is not entirely clear as to the timeline of the events at issue, it avers that the minor victim was 13 years old at the CAC interview and stated that Mr. Nordin

"touched her inappropriately, had her touch him, and took pornographic pictures of her … over multiple years that she knew" him. (Ex. 1 at 3.) The minor victim cited examples from when she "was really young, possibly 8-years-old" when Mr. Nordin took pictures of her in the shower while he himself was also nude, and that she saw nude images of herself saved on his phone. *Id*. Under these circumstances, the undersigned does not find that the warrant application was based on stale information.

First, the young age (eight) of the minor victim when some of the activities described began provides an explanation as to the delay of approximately five years in reporting. Also, the minor victim reported that these activities took place over "multiple years," presumably starting at age eight onwards, which shortens the delay. This, coupled with the fact that individuals involved in sexual exploitation of children "rarely, if ever, dispose of their sexually explicit material," and keep their materials in a secure place, most frequently their homes, indefinitely, provides a sufficient basis so as to not render the information in the affidavit stale. Accordingly, as to this argument, the motion should be denied.

### 3. Good faith exception

Even if the search warrant lacked probable cause or lacked particularity, Det. Walker and his fellow officers acted in good faith pursuant to *United States v. Leon*, 468 U.S. 897, 921 (1984). Under the *Leon* good faith exception, the Fourth Amendment's exclusionary rule does not bar the admission of evidence if the "officers executing an invalid search warrant did so in good faith*." United States v. Ortiz-Cervantes*, 868 F.3d 695, 702 (8th Cir. 2017). The good-faith inquiry is confined "to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization.'" *United*

*States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (quoting *Leon*, 468 U.S. at 922 n. 23). There are four situations to consider in assessing whether an officer acted in good faith:

> (1) the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Dickerman*, 954 F.3d 1060, 1065 (8th Cir. 2020) (emphasis removed). As follows, Det. Walker acted in good faith, even if the warrant lacked probable cause, and as a result the evidence obtained from the search of the apartment should not be suppressed.

### a. False statements

An officer's reliance on a warrant is unreasonable if the affidavit "contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge." *Dickerman*, 954 F.3d at 1065. Here, there is no evidence that the affidavit contained any false statements or omissions made deliberately or with reckless disregard for the truth. Accordingly, this situation is not present, supporting the conclusion that Det. Walker acted in good faith.

### b. Abandonment of judicial role

An officer's reliance on a warrant is unreasonable if the issuing judge "wholly abandoned his judicial role in issuing the warrant." *Id.* A judge abandons his or her judicial role when he or she "does not serve as a neutral and detached actor, but rather as a rubber stamp for the police and an adjunct law enforcement officer." *Ortiz-Cervantes*, 868 F.3d at 703 (quoting *United States v. Long*, 797 F.3d 558, 567 (8th Cir. 2015)). Examples of abandonment include not reading the warrant or not recognizing the application was either unsigned or failed to identify the property to

13

be searched. *Dickerman*, 954 F.3d at 1067; *Ortiz-Cervantes*, 868 F.3d at 703. Also, a judge violates the obligation to be neutral if he has a "pecuniary interest in issuing the warrant" or has "actively participated in the police investigation." *Dickerman*, 954 F.3d at 1067-68.

Here, there is no evidence the issuing judge abandoned his judicial role as a neutral and detached actor. The warrant application was signed by the issuing judge, who verified its allegations, found probable cause to believe those allegations, then signed and issued the search warrant. There is no evidence that the issuing judge had any conflict of interests or actively participated in the investigation. Thus, this situation is also not present, again supporting the *Leon* good faith exception.

### c.  Indicia to support probable cause

Reliance on the warrant would not be in good faith if the affidavit in support is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable.*" *Id.* at 1065 (emphasis in original). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 at 921. Further, a "consistent finding of probable cause by every judge who independently reviewed the affidavit, satisfies us that the affidavit bore sufficient indicia of probable cause to render the investigating officers' reliance on it objectively reasonable." *United States v. Ross*, 487 F.3d 1120, 1124 (8th Cir. 2007).

Here, the affidavit provided sufficient indicia to make the reasonable belief that probable cause was established. The affidavit was reviewed and approved by the issuing judge. Det. Walker is not an attorney, so his reliance on the determinations made by the issuing judge was reasonable. Additionally, as discussed above, the undersigned finds that the warrant application established probable cause.

14

### d. Facially deficient warrant

Lastly, reliance on a warrant is unreasonable if "the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid." *Dickerman*, 954 F.3d at 1065. A warrant is facially deficient when it "fail[s] to particularize the place to be searched or the things to be seized..." *United States v. Carpenter*, 341 F.3d 666, 673 (8th Cir. 2003) (quoting *Leon*, 468 U.S. at 923) (internal quotations omitted). Further, the warrant's level of ambiguity is indicative of whether it is facially deficient. *Id.*

Here, the warrant was not so facially deficient that Det. Walker could not presume it to be valid. The warrant specifically identifies the place to be searched as well as the property and materials sought. As a result, the warrant was not facially deficient, again supporting good faith reliance.

### 4. Conclusion

Based on the foregoing, the undersigned concludes that warrant application contained sufficient information to support a finding of probable cause for issuance of the search warrant and was not lacking for either particularity or staleness. Furthermore, even if the warrant application was not supported by probable cause or lacked for particularity or was stale, the law enforcement officers acted in good faith in executing the warrant and did not exceed the warrant's scope. Accordingly, the *Leon* good faith exception applies, and the evidence obtained following execution of the warrant should not be suppressed.

### B. Statements made on August 13, 2020

Next, Defendant asserts two arguments in support of his contention that his August 13, 2020 statements should be suppressed. First, he claims his statements should be suppressed as fruit of the warrantless search and of an illegal seizure of his person. In support of his argument

15

that he was illegally seized, Defendant asserts that his statements both inside and outside of the apartment were not made as an act of freewill. Second, he contends his statements were obtained in violation of his rights under the Fifth Amendment and should be suppressed.

### 1. Fruit of the poisonous tree

First, Defendant contends his "statements both inside and outside of the apartment were not made as an act of freewill sufficient to purge the taint of the illegal entry into the apartment and the seizure of his person." (Doc. 41 at 6.) Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As discussed above, however, the search warrant was supported by probable cause, and even if it was not, the *Leon* good-faith exception applies. As a result, the officers' entry into the apartment to execute the search warrant was legal and did not violate any of Defendant's constitutional rights.

Defendant further claims that he was seized under the Fourth Amendment, and as a result his statements made on August 13, 2020, were not voluntary. Upon review, the undersigned does not agree that Defendant was seized. A seizure of a person under the Fourth Amendment occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (cleaned up). Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, include "officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the

16

person's property, or an officer's indication the person is the focus of a particular investigation." *United States v. Griffith*, 533 F.3d 979, 983 (2008).

Here, there is no indication that the officers positioned themselves in a way to limit Defendant's freedom of movement. Although an officer was present with Defendant at all times, this was done for officer safety and to allow the search to proceed unimpeded. And, although Det. Walker accompanied defendant when he got up to walk to relive his back pain, this was done to allow the interview to continue, not to prevent defendant from leaving.

There were five officers present at the scene, but for the majority of the encounter, Defendant was on the patio in the presence of only two officers, Det. Walker and Det. Burnett. *See United States v. Axsom*, 280 F.3d 496, 502 (8th Cir. 2002) (holding casual two-way questioning by two officers in a suspect's home was not police dominated.) And, although one or two of the officers had their guns drawn as they approached the apartment, the guns were quickly holstered once it was clear that there was no threat present.

There was no evidence presented as to any physical touching of Defendant by any officer. Further, throughout their interaction, Det. Walker spoke to Defendant in a calm and respectful manner, only demanding compliance as to the surrender of Defendant's phone pursuant to the search warrant. And, although Det. Walker did seize Defendant's phone, this would not have prevented Defendant from leaving the premises. S*ee Florida v. Royer,* 460 U.S. 491, 503 n.9 (1983) (noting officers taking possession of defendant's airline ticket, luggage, and identification contributed to determination defendant had been seized because "[a]s a practical matter, Royer could not leave the airport without them.") Lastly, Det. Walker advised Defendant when they first met and again at the start of the interview on the patio that Mr. Nordin, and not Defendant, was the focus of the investigation.

17

Considering all of the above factors, along with the fact that Det. Walker clearly advised Defendant at the start of the interview on the patio that his participation in the interview was voluntary, the undersigned cannot conclude that Defendant was "seized" for Fourth Amendment purposes. As a result, there was no violation of Defendant's rights, because the officers' entry into the apartment was done pursuant to a valid search warrant, and Defendant was not seized as contemplated by the Fourth Amendment. Accordingly, as the police did not act illegally, Defendant's statements made inside and outside of the apartment should not be excluded.

## 2.     Defendant was not in custody under *Miranda*

In the alternative, Defendant contends his statements were obtained in violation of his rights under the Fifth Amendment and should be suppressed. The Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, "an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). As follows, however, the undersigned does not agree with Defendant's claim that he was in custody while being interviewed by Det. Walker and Det. Burnett.

To determine if an individual is in custody during an interrogation, the court must consider whether, under the objective circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006). The "critical inquiry is [] whether the defendant's freedom to depart was restricted in any way." *Id*. The Eighth Circuit has identified six non-exclusive factors to be applied in determining whether an individual was in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or

18

that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Upon consideration of the six *Griffin* factors, the undersigned concludes that Defendant was not in custody during the questioning.

.                              **a.    *Griffin* factor one**

The first factor considers whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest. This factor weighs heavily against Defendant.

Here, at the start of the interview on the patio, Det. Walker told Defendant that he was not the focus of the investigation and that he did not have to talk to them, making it clear to Defendant the interview was voluntary, or optional. Det. Walker also told Defendant he did not intend to arrest anyone. Accordingly, Defendant was clearly informed that was not considered under arrest. Therefore, because Defendant was expressly advised that the questioning was voluntary and that he was not under arrest, the first factor weighs against finding that Defendant was in custody during the interview.

**b.    *Griffin* factor two**

The second factor asks whether the suspect possessed unrestrained freedom of movement during questioning. The undersigned finds that the evidence does not support this claim. First, Defendant was neither handcuffed nor physically or verbally restrained in any way during the interview. Defendant was interviewed on an open patio outside the apartment and got up to walk around the parking lot several times to ease his back pain. In short, the evidence shows that

19

Defendant possessed unrestrained freedom of movement during the interview, and this factor weighs against finding that Defendant was in custody during the interview.

### c. *Griffin* factor three

The third factor requires consideration of whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions. Here, the officers initiated the contact with Defendant while executing the search warrant. However, Defendant was polite and cooperative throughout the interview. Accordingly, the third factor is neutral.

### d. *Griffin* factor four

Under the fourth factor, the court considers whether strong arm tactics or deceptive stratagems were employed during questioning. The relevant inquiry here is whether the officers' tactics or deception would cause a reasonable person "to perceive the coercion as restricting his or her freedom to depart." *United States v. Axsom*, 280 F.3d 496, 502 (8th Cir. 2002) ("some degree of coercion is part and parcel of the interrogation process").

Here, Det. Walker spoke in a calm and respectful manner throughout the interview and Defendant freely and willingly answered his questions. And, although one or two officers drew their guns for safety reasons as they initially approached the apartment, they quickly holstered them once it was apparent there was no threat, and from then on, the officers never removed or brandished their firearms, nor acted threatening in any way. In short, the officers did not strong-arm or deceive Defendant in a way that would have caused a reasonable person to believe he could not ask them to end the interview. Thus, this factor does not support a finding that Defendant was in custody.

### e. *Griffin* factor five

The fifth factor, whether the atmosphere of the questioning was police dominated, requires consideration of "the entire context of the questioning, including such considerations as place and length of the interrogation." *Griffin*, 922 F.2d at 1352.

Here, the interview took place on an open patio outside the apartment and in the parking lot. *See Axsom*, 280 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial"). And, during the interview, there were only one or two officers present with defendant. *See Axsom*, 280 F.3d at 502 (holding casual two-way questioning by two officers in a suspect's home was not police dominated.) In light of these circumstances, the undersigned cannot find any evidence that the interview was police dominated. Accordingly, this factor weighs against finding that Defendant was in custody.

### f. *Griffin* factor six

Finally, the sixth factor asks whether the suspect was placed under arrest at the termination of the questioning. This factor does not support a finding that the interview was custodial, as there is no dispute that Defendant was not arrested at the end of the interview.

### g. Conclusion

Based on the foregoing, upon consideration of the six factors set forth in *Griffin*, the undersigned concludes that under the objective circumstances of the interview, a reasonable person would have felt he or she was at liberty to terminate the interview. Therefore, Defendant was not "in custody" during the interview, and, as a result, his rights against self-incrimination were not violated.

### C. Statements made on August 19, 2020

Lastly, Defendant moves for suppression of his subsequent statements made on August 19, 2020. He admits that he was read his *Miranda* rights on that date and does not claim that he was in custody or that he did not feel at liberty to terminate the interrogation and leave. Rather, he argues that his August 19, 2020 statements should be suppressed as fruit of the alleged illegal search, seizure, detention, and unconstitutional custodial interrogation on August 13, 2020

Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As discussed above, however, on August 13, 2020, the entry into and search of the apartment was pursuant to a valid warrant, Defendant was not seized for Fourth Amendment purposes, and he was not in custody during the interview. As a result, because there were no unlawful actions by the officers on August 13, 2020, Defendant's fruit of the poisonous tree contention fails.

### IV. Recommendation

Based on the foregoing, it is **RECOMMENDED** that Defendant's Amended Motion to Suppress Statements and Evidence be **DENIED**.

/s/ David P. Rush
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE: March 20, 2023